IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

MARGARET TERESA JOHNSON,

       Plaintiff,

vs.                        CASE NO. 1:15-cv-212-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Acting

Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for disability insurance benefits ("SSDI") and supplemental

security income ("SSI") benefits pursuant to Title II and Title XVI,

respectively, of the Social Security Act ("the Act"). (ECF No. 1.) The

Commissioner has answered (ECF No. 10), and both parties have filed

briefs outlining their respective positions. (ECF Nos. 15–16.) For the

reasons discussed below, it is recommended that the Commissioner's

decision be affirmed.

# I.  PROCEDURAL HISTORY

Plaintiff protectively filed her application for SSDI and SSI on

February 22, 2012, alleging a disability onset date of March 2, 2009. (R.

174–86.) Plaintiff alleged that she can longer work due to bipolar disorder.

(R. 206.) Her application was denied initially and upon reconsideration. (R.

103–106.) Following a hearing on January 22, 2014, an administrative law

judge ("ALJ") issued a decision unfavorable to Plaintiff. (R. 8–28.) The

Appeals Council denied Plaintiff's request for review. (R. 1–6.) On October

7, 2015, Plaintiff filed the instant appeal. (ECF No. 1.)

# II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by

substantial evidence. *See* 42 U.S.C. § 405(g) (2000). Substantial evidence

is more than a scintilla, i.e., the evidence must do more than merely create

a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the

conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen,* 793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider evidence detracting from evidence on which the Commissioner relied). However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505 (2005).[1] The impairment

must be severe, making Plaintiff unable to do his previous work, or any

other substantial gainful activity which exists in the national economy. 42

U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

    The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the

existence of a disability as defined by the Social Security Act. *Carnes v.*

*Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is

working at a substantial gainful activity, he is not disabled. 20 C.F.R. §

404.1520(b). Second, if a claimant does not have any impairment or

combination of impairments which significantly limit his physical or mental

ability to do basic work activities, then he does not have a severe

impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a

claimant's impairments meet or equal an impairment listed in 20 C.F.R.

Part 404, Subpart P, Appendix 1, he is disabled. 20 C.F.R. § 404.1520(d).

---

    [1] All further references to 20 C.F.R. will be to the 2005 version, unless otherwise
specified.

Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled. 20 C.F.R. § 404.1520(f).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

## III.  SUMMARY OF THE RECORD

**A.  Medical Evidence**

Plaintiff began treating with R. A. Lee Pack, M.D., at Family Practice Associates ("FPA") in 2001. (R. 336.) Initially, Plaintiff reported stress and anxiety. Dr. Pack treated Plaintiff with various anxiety medications. Plaintiff later reported to Dr. Pack that she saw a psychiatrist sometime around May 2003. The psychiatrist added Depakote to Plaintiff's prescription regimen. (R. 325.)

Plaintiff voluntarily presented to Shands Hospital for polysubstance abuse on July 28, 2004. She admitted that she had been using crack cocaine for the past several years. Plaintiff was examined and diagnosed with cocaine dependence, polysubstance abuse, and mood disorder, not otherwise specified. (R. 307–09.) She remained at Shands for treatment until August 12, 2004. During her hospitalization she was evaluated and

diagnosed with bipolar disorder. The physician initiated Plaintiff on Lithium and Zyprexa, which caused Plaintiff's mood to stabilize. (R. 310.)

After Plaintiff was discharged from Shands, Dr. Pack continued Plaintiff on Lithium and Zyprexa for bipolar disorder. (R. 322.) Plaintiff returned to FPA on October 10, 2008 and admitted, however, that she could no longer afford the medications because she lost her job. She reported that she had not been taking her medications for almost two years. She was also experiencing increased anxiety because she was being audited by the IRS. Plaintiff asked to gradually resume Zyprexa and Lithium. (R. 314.)

Plaintiff reported to FPA in January 2009 and admitted that she again discontinued Lithium and Zyprexa due to cost. Dr. Pack instructed Plaintiff to go back on Lithium and also try Fluoxetine. (R. 373.) At a follow-up on July 28, 2009, Plaintiff reported being compliant with her medical regimen. Dr. Pack opined that Plaintiff's bipolar disorder was stable. (R. 370.)

Plaintiff returned to FPA on February 10, 2011 seeking medication refills. She stated that she discontinued Lithium because she was concerned about kidney dysfunction. Dr. Pack instructed Plaintiff to resume Lithium and Fluoxetine. (R. 379.)

When Plaintiff presented to FPA on March 30, 2012, she admitted that she has a difficult time staying on her medications when things get better. She stated that she sees a psychiatrist sporadically when she gets around to it. She also cannot hold down a job. She is usually able to get through the application process but the interview usually goes awry.

Dr. Pack reviewed Plaintiff's recent lab results, which revealed elevated liver function tests. Dr. Pack advised against drinking due to her elevated liver function tests. Dr. Pack also discussed the importance of compliance with her medical regimen for her bipolar disorder, but stated that it was difficult for Plaintiff to stay focused on her mental health needs. Dr. Pack opined in her professional opinion based on the information she had available and her long-term care of Plaintiff that Plaintiff is "totally disabled." (R. 378.)

William Beaty, Ph.D., evaluated Plaintiff on April 10, 2012. Plaintiff reported working in outside sales for various companies. Her last job, however, was verifying mortgage documents in a computer and only lasted four weeks. Afterwards, she started training to become an insurance agent but quit after eight weeks because she was not making any money.

Plaintiff denied having a problem with the job. Plaintiff further reported that her activities of daily living include using the computer to look for jobs for which she is qualified. She stated that she is not happy with people, believes most people are liars, cheats and thieves, and prefers to avoid people because she does not trust them.

Examination revealed a depressed mood. Plaintiff's affect was sad, constricted, and flat. She was, however, oriented to person, place, time, date, and reason for evaluation. She spoke normally and demonstrated intact and organized thought process. She did not exhibit delusions or paranoia and her thought content was appropriate to the topics discussed. Plaintiff demonstrated average cognitive ability, was pleasant, cooperative, answered questions readily, and maintained good eye contact. Dr. Beaty diagnosed Plaintiff with Bipolar Disorder, NOS, Generalized Anxiety Disorder, and Cocaine Abuse in remission. Dr. Beaty also assessed Plaintiff a GAF of 50. (R. 416–18.)

On July 6, 2012, Lance Chodosh, M.D., examined Plaintiff as part of her disability determination. Although Plaintiff was being treated with medication by Dr. Pack, Plaintiff acknowledged not seeking psychiatric or

mental health help. She admitted that she stopped working because she was unsuccessful and was not earning any money. Plaintiff was "slightly weathered appearing," hyperactive and fidgety. She was, however, fully oriented and cooperative. Dr. Chodosh opined that Plaintiff has mental health issues, including probable bipolar disorder. (R. 409–11.)

Dr. Beaty evaluated Plaintiff again on July 13, 2012. Plaintiff's mood was euphoric and her behavior manic. She spoke fast and skipped around topics. She demonstrated expansive affect and was oriented. Although Plaintiff displayed intact thought process, it was tangential and disorganized. She exhibited no delusions or paranoia and her thought content was appropriate to the topics discussed. Plaintiff demonstrated average to high average cognitive ability. She was pleasant, cooperative, readily answered questions, maintained good eye contact, and was responsive to Dr. Beaty's efforts to guide and focus the discussion. Neither Dr. Beaty's diagnoses nor GAF score changed. (R. 414–15.)

Dr. Pack completed a medical assessment of ability to do work-related activities for Plaintiff in February 2013. Based on Plaintiff's "long

history of bipolar disorder and Hepatitis C,[3] Dr. Pack opined that Plaintiff

has poor or no ability to deal with the public, interact with supervisors, or

deal with work stresses. Plaintiff has fair ability to relate to co-workers, use

judgment, function independently, and maintain attention and

concentration. She also has good ability to follow work rules. In addition,

based on Plaintiff's inability to pay attention, Plaintiff has poor or no ability

to understand, remember, and carry out complex instructions. She has fair

ability, however, to understand, remember, and carry out detailed, but not

complex job instructions. Moreover, Plaintiff has good ability to understand,

remember, and carry out simple job instructions. Dr. Pack further opined

that Plaintiff has poor or no ability to behave in an emotionally stable

manner, relate predictably in social situations, or demonstrate reliability.

Plaintiff does have fair ability to maintain personal appearance however.

Dr. Pack asserted that Plaintiff "is unable to function in any kind of stressful

situation." Plaintiff can, however, manage benefits to her own best interest.

(R. 468–70.)

Plaintiff began treating with Westside Samaritans Clinic ("WSC") in

---

[3] Plaintiff was diagnosed with Hepatitis C in late 2012. (R. 484.)

April 2013. At her appointment on May 2, 2013 Plaintiff reported she has

depressive symptoms but that her ability to deal with the symptoms is

"OK."  (R. 501.) On May 23, 2013, however, Plaintiff reported she was in a

bad mood for the past few days. Although she rated her bipolar disorder as

an eight out of ten, she was not currently receiving psychiatric care.

Plaintiff also reported previously using cocaine but stopping because she

could no longer afford it.

Examination revealed agitated appearance, attitude, and motor

activity, elevated mood and affect, and pressured speech. Plaintiff's

perception, however, was appropriate, she was alert and oriented,

demonstrated good concentration, and used appropriate language. Plaintiff

reported not taking Lithium as prescribed because she was currently in

school getting her MBA and could not remember, think, talk, or reason

when taking Lithium as prescribed. (R. 498.) The physician took Plaintiff off

Lithium and decreased her Prozac dosage. (R. 498–99.)

When Plaintiff returned to WSC on June 6, 2013 she reported doing

fairly well with her medication changes. Although she had a couple of

anger outbursts, she improved. Her mother even mentioned that she was

laughing more. Her occasional depression had improved as well. The physician increased Plaintiff's Paxil and Resperidol dosages and discontinued her Prozac. (R. 496.)

Plaintiff was referred to Janet Humphreys, Ph.D., for a psychological evaluation on July 23, 2013. (R. 475.) Plaintiff spoke nonstop at a rapid rate in a loud voice, had to be interrupted repeatedly, and gave tangential responses to questions. Plaintiff was cooperative but demonstrated an anxious mood and variable and expressive affect. There was, however, no peculiarity or bizarreness in her thought content. While Plaintiff reported occasionally hearing voices calling her name and seeing shadows she did not hear any during the examination. Plaintiff demonstrated poor judgment and insight. When asked what she should do if she were to find someone's wallet, she replied, "Take the money and throw it in the garbage." (R. 476.) Nonetheless, Plaintiff was well oriented to person, place, and time, her remote memory appeared to be intact, she gave adequate information, was able to perform simple multiplication, and demonstrated adequate thinking. (*Id.*)

Dr. Humphreys diagnosed Plaintiff with Bipolar I Disorder and Anxiety

Disorder NOS. Dr. Humphreys opined that Plaintiff may benefit from a pharmacological evaluation and psychotherapy. She further opined that Plaintiff's "concentration, immediate, and recent memory appeared impaired, and may impact her ability to carry out complex instructions." (*Id.*) Plaintiff's remote memory, however, appeared grossly intact. Dr. Humphreys stated that Plaintiff's "social skills and judgment as well as her ability to perform simple repetitive tasks may be affected by her mood disorder and anxiety." (*Id.*)

Dr. Humphreys also completed a medical source statement of ability to do work-related activities for Plaintiff. Dr. Humphreys opined that Plaintiff had marked restriction in carrying out simple instructions, making judgments on simple work-related decisions, carrying out complex instructions, and making judgments on complex work-related decisions. She had moderate restriction in understanding and remembering complex instructions, and mild restriction in understanding and remembering simple instructions. Dr. Humphreys based her opinion on the finding that Plaintiff was "extremely tangential in her thought processes. Questions had to be repeated - often more than once." (R. 472–74.) Dr. Humphreys further

opined that Plaintiff's ability to interact appropriately with the public,

supervisors, and co-workers was markedly affected, as was her ability to

respond appropriately to usual work situations and to changes in a routine

work setting. This opinion was based on Plaintiff being talkative, speaking

loudly, rapidly, and pressured. In addition, because Plaintiff often talked

over Dr. Humphreys. Dr. Humphreys further asserted that Plaintiff's

response to the question about the wallet that she would take the money

and throw the wallet away, showed antisocial traits. (*Id.*)

Plaintiff presented to WSC on July 18, 2013 for medication refills.

Plaintiff was extremely agitated during the interview and did not want to

answer any questions about her symptoms. She walked out of the room

and threatened to go to another clinic until she was convinced to stay and

see Dr. Baxter. Plaintiff did admit, however, that her medications were

working fairly well for her. (R. 495.)

When she returned to WSC on September 12, 2013 she reported

being calmer and less stressed. Although she is not currently suicidal, she

reported a suicide attempt two years ago in an effort to get rid of an ex

boyfriend. Plaintiff stated that she did not have mood swings of a disabling

nature; nonetheless, she was trying to get disability. She was alert,

oriented, displayed no agitation or obvious appearance of depression. She

smiled appropriately at times but was mildly depressed. Her affect was

appropriate to content, she had a normal rate and rhythm of speech, and

her thoughts were clear and coherent. (R. 493.)

## B.  Opinion Evidence

On July 20, 2012, Barbara Lewis, Ph.D., a state agency psychologist,

completed a mental residual functional capacity ("MRFC") assessment for

Plaintiff. Dr. Lewis opined that Plaintiff does not have understanding and

memory limitations but does have sustained concentration and persistence

limitations. Specifically, Plaintiff has moderately limited ability to maintain

attention and concentration for extended periods. Nonetheless, Plaintiff is

able to maintain sufficient concentration for tasks. Her ability to carry out

very short and simple instructions and detailed instructions is not

significantly limited. Nor was her ability to perform activities within a

schedule, maintain regular attendance, be punctual, sustain an ordinary

routine without special supervision, work in coordination with or in proximity

to others without being distracted by them, or make simple work-related

decisions. Dr. Lewis also concluded that Plaintiff's ability to complete a

normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods is not significantly limited.

With respect to social interaction limitations, Dr. Lewis opined that

Plaintiff has a moderately limited ability to interact appropriately with the

general public. But, Plaintiff's ability to ask simple questions or request

assistance and to accept instructions and respond appropriately to criticism

from supervisors is not significantly limited. Nor is her ability to get along

with coworkers or peers without distracting them or exhibiting behavior

extremes. Plaintiff's ability to maintain socially appropriate behavior and to

adhere to basic standards of neatness and cleanliness is also not

significantly limited. Thus, Dr. Lewis opined that while Plaintiff would have

difficulty with extensive public contact, Plaintiff is, nonetheless, capable of

engaging in brief interpersonal interactions necessary for task

performance. (R. 459–60.) Dr. Lewis went on to opine that Plaintiff

> can understand, retain, and carry out simple instructions.
> [Plaintiff] can consistently and usefully perform routine tasks on
> a sustained basis with minimal (normal) supervision, cooperate
> effectively with others in completing simple tasks and

transactions, adapt over time to most changes and task demands, make simple decisions and take appropriate precautions for normal hazards. [Plaintiff] retains the ability to perform simple, repetitive tasks and likely has abilities to perform tasks at higher levels in spite of the moderate limitations noted above.

(R. 460.)

## C.  Hearing Testimony

At the hearing on January 22, 2014, Plaintiff was 60 years old. (R. 33.) She testified that she cannot focus or concentrate on reading a newspaper article. She reads headlines, the first two paragraphs, and the last paragraph because it takes too long to read the entire article and she cannot comprehend or remember the information in the middle. She is very hyper but falls asleep before a movie is over. (R. 90.) She gets angry and acts out on her anger by slamming and throwing things. (R. 91.) When she goes to the grocery store she is impatient, gets angry at people, and yells at the manager. (R. 92.) Sometimes she sleeps through the night, but other times she wakes up every hour. She also usually takes a nap during the day. (R. 94.)

Plaintiff stopped working in March 2009 because she was laid off. (R. 34–35.) She was reprimanded every week because when she went into the

office and blew up at people. She could handle working outside the office

doing sales because she was not around other people and could do her

own thing. (R. 84.) She admitted that if she had not been laid off she would

have continued working. (R. 34.) After she was laid off she continued

looking for jobs until the beginning of 2011. She got several interviews but

did not get the jobs, likely because she was too desperate. (R. 42.) Her last

job was for eight weeks in early 2011 doing mortgage papers. She only

worked there a very short time however because she got angry at them

and was unsatisfied with the pay. (R. 50.) Plaintiff could not, however, go

back to work now. (R. 35.)

Plaintiff currently treats with a psychiatrist, Dr. Alex Baxter. She also

treated with other psychiatrists "a long time ago," but they made her angry

She walked out of one psychiatrist's office after throwing a couch. Another

time the psychiatrists ended up suing each other because one made

Plaintiff wait for an hour and a half. (R. 44.)

When Plaintiff met with Dr. Humphreys she lied about when she

stopped using cocaine. She testified that she stopped using cocaine in

2004. (R. 45.) Plaintiff is currently faithful in taking her medication and does

not stop taking it when she starts feeling better. (R. 46.) The medication has helped stabilize her moods. (R. 88.) She does, however, still experience periods of highs and lows. When she is in a state of high she has a lot of energy and will decide to do something like re-catalog all of her files or repaint the room. Then she wakes up the next morning and decides she cannot do it. (R. 85.) When she is in a state of low she stays in bed, is irritated, gets angry, cries, and does not want to do anything. She suffers low days approximately ten days a month. (R. 86.)

Alfred Jonas, MD, also testified at the hearing as a psychological expert. He asserted that Plaintiff's current medication dosages are very low and her treatment is not very aggressive. Dr. Jonas testified that he does not know that there is "really enough here for a firm diagnosis of mania or bipolar disorder." (R. 55.) The reports from Dr. Beaty and Dr. Humphreys present generalized anxiety disorder and unspecified anxiety. Apart from the concept of expansive affect, rapid nonstop speech, tangential thought process, and anxiety, the record does not demonstrate that Plaintiff generally presents as anxious. Dr. Jonas testified therefore that "it may be that what people are seeing might be either just [Plaintiff's] innate style or it

could be a partially treated hypomania." (R. 56.)

Dr. Jonas believes Plaintiff has at most a moderate impairment in appropriate social functioning based on her expansive affect, rapid nonstop speech, and tangential thought process. Typically, however, people do not develop hypomania or bipolar disorder when they are 51 years old. Normally by the time someone is 51 they have had bipolar disorder for about 30 years. Dr. Jonas opined that "whatever [Plaintiff] has been doing throughout the course of her life, she has been doing more or less the way she is now. According to Dr. Jones, "what that potentially suggests is that if she was successful in sales over a long period of time, then that reflects a pretty good interpersonal capacity." (R. 57.)

Similarly, Dr. Jonas said there are no meaningful indicators of an impairment in concentration, persistence, and pace. Cognitive functioning and mental state examinations are always normal. Dr. Jonas does not think Plaintiff has much of a cognitive impairment. Additionally, based on the fact that Plaintiff left her last job because she was dissatisfied with the compensation, Dr. Jonas opined that Plaintiff is just not having a good time finding a job in a terrible economy where a lot of people cannot find work. There are "really no identifiable periods of decompensation, at least within

the period we are looking at." (R. 59.) Plaintiff may or may not have hypomania, but she does not have a significant B criteria impairment. She therefore cannot meet or equal a listing. (*Id.*)

Although Dr. Humphreys opined that Plaintiff has a marked ability to interact appropriately with supervisors, coworkers, and the public, Dr. Jonas believes that Dr. Humphreys did not take into account that Plaintiff understood and carried out complex instructions. For example, Plaintiff repeated five numbers forward and six numbers backward. It is harder, however, to repeat numbers backward than it is forward. Plaintiff understood the task. Setting that aside, Dr. Jonas said that Dr. Humphreys' conclusions in the medical source statement are not unreasonable. But looking at the rest of the record, Plaintiff generally gets along with people okay, especially people who are treating and evaluating her. According to Dr. Jonas, if Dr. Humphreys knew that Plaintiff's performance at her last job was good and that she was merely dissatisfied with the money, "we would imagine that she would not have thought [Plaintiff] was as impaired as she said she thought." (R. 63.) Dr. Jonas understands from the context of the 19F examination where Dr. Humphreys was coming from, but does not think Dr. Humphreys' assessment is accurate when you look at Plaintiff

as a whole in the context of the entire record. (*Id.*)

As far as Plaintiff's reports of hallucinations, Dr. Jonas testified that "[t]here is essentially no such thing as simply hallucinations in the absence of any other problem. So, if somebody has auditory hallucination, then they have to have a medical psychiatric condition or some kind of problem that would cause auditory hallucinations, and we don't have that here." (R. 69.) People who have bipolar disorder that might actually have auditory hallucinations are people who are considerably manic or very deeply depressed. People like Plaintiff that are never more than hypomaniac would not be expected to have auditory hallucinations. (R. 70.) The only evidence in the record regarding Plaintiff being manic was back in 2004 when Plaintiff was also under the influence of cocaine. (R. 71.) Dr. Jonas went on to testify that although there is some evidence of expansive affect in exhibit 11F, rapid nonstop speech and tangential thought process in exhibit 19F, and an elevated but not expansive mood with tangential thought process in exhibit 20F, the record does not demonstrate enough to support a conclusion of hypomania. (R. 71–72.) Thus, Dr. Jonas concluded that "we are left with the possibility that this is just somebody's personal style." (R. 72.) Dr. Jonas explained that bipolar disorder does not get worse

with age if you do not treat it. Usually it gets better with age. (R. 75–76.)

With respect to Dr. Pack's limitations, Dr. Pack's assessment suggests "a very symptomatic, very dysfunctional person, not the person who had the 25 year job and the 12 year job." (R. 77.) Moreover, in spite of Dr. Pack's assessment, Dr. Pack still thinks Plaintiff is capable of independent management of finances. According to Dr. Jonas, this does not make sense for someone who is as impaired as Dr. Pack suggests. Furthermore, despite Dr. Humphreys' marked areas of inquiry, Dr. Humphreys also understood from Plaintiff that she did in fact handle finances independently. "[I]f Dr. [P]ack thinks that claimant can handle finances independently, and if in fact the claimant does handle finances independently, then Doctors [P]ack and Humphr[eys] cannot be right about all of those marked and extreme estimates. Somebody with all of that impairment cannot handle finances independently." (R. 78.)

Dr. Jonas also asserts that the GAF score Dr. Beaty assessed Plaintiff with is irrelevant. A GAF score is nothing other than an estimate and can be very different from one day to another. Based on the entire record, there is no reason to assume that Dr. Beaty's GAF score assessment is correct. (R. 79–80.)

## D.  The ALJ's Findings

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014. He further determined that Plaintiff had not engaged in substantial gainful activity since March 2, 2009. The ALJ found that Plaintiff had the severe impairment of bipolar disorder. (R. 13.) At step three of the sequential evaluation, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (R. 15.)

With respect to Plaintiff's residual functional capacity at step four of the sequential evaluation, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but in terms of nonexertional limitations, Plaintiff can perform only unskilled work involving occasional public contact. (R. 17.)

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause Plaintiff's alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible for the reasons discussed in the ALJ's decision. (R. 18.) The ALJ

determined at step four that Plaintiff was unable to perform any past relevant work. (R. 21.) Nonetheless, considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 22.) Accordingly, the ALJ concluded that Plaintiff has not been under a disability from March 2, 2009, through the date of the ALJ's decision. (R. 23.)

## IV.  DISCUSSION

The sole issue Plaintiff raises on appeal is whether the ALJ erred by rejecting the opinion of Dr. Pack, the treating physician. (ECF No. 15 at 2.)

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 416.927(d)(2). Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so. *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory

that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991) (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).

If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion being deemed accepted as true as a matter of law. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir. 1992). The Commissioner's reasons for refusing to credit a treating physician's opinion must be supported by substantial evidence. *MacGregor*, 786 F.2d at 1054.

In this case, after reviewing Dr. Pack's opinion that Plaintiff is totally disabled and her February 2013 assessment the ALJ concluded that Dr. Pack's "opinions are largely inconsistent with the medical evidence." (R. 20.) The ALJ then gave explicit and adequate reasons supported by substantial evidence for giving Dr. Pack's opinions little weight.

Specifically, the ALJ pointed to Plaintiff's ability to understand, remember, and carry out simple tasks. The ALJ also noted Plaintiff's ability to get along well with treatment providers, and the fact that Plaintiff is able to participate in activities outside of her home. Thus, the ALJ found Plaintiff was not as limited in interacting with others as Dr. Pack indicated.

In addition, the ALJ discussed how Plaintiff conducts herself in an appropriate manner during appointments, which suggests that she can relate predictably, act in an emotionally stable manner, and use judgment. Similarly, the ALJ pointed out that no provider has ever noted that Plaintiff appears disheveled. And the ALJ relied upon the fact that Plaintiff performs a variety of daily activities on her own, which evidence that she can function independently and reliably. The ALJ concluded that although "the evidence does support Dr. Pack's determination that [Plaintiff] can perform simple work tasks, it conflicts with the remainder of the limitations she describes." (*Id.*) These reasons are more than sufficient to support the ALJ's conclusion to discount the opinion of Dr. Pack that Plaintiff is "disabled."

The ALJ did not, however,  wholly reject Dr. Pack's opinion, as Plaintiff suggests. Although Dr. Pack opined that Plaintiff could not

understand, remember, and carry out complex job instructions, Dr. Pack, nonetheless, found that Plaintiff can understand, remember, and carry out detailed and simple job instructions. The ALJ took this limitation into consideration in limiting Plaintiff to only unskilled work.

Moreover, substantial evidence supports the ALJ's conclusion that Dr. Pack's opinion is not supported by the evidence. Although Dr. Pack opined in March 2012 that Plaintiff is "totally disabled," Plaintiff reported to Dr. Pack during the same visit that she has a difficult time staying on her medications when things get better—thereby suggesting that medication improves Plaintiff's condition.  And even though Plaintiff told Dr. Pack that she cannot hold down a job, Plaintiff admitted to Dr. Beaty only one month later that she quit her last job training to become an insurance agent because she was not making any money. Plaintiff also told Dr. Beaty that part of her daily activities include looking online for work, which belies her assertion that she cannot work.

Dr. Pack's conclusion that Plaintiff cannot work appears to be wholly based on Plaintiff's subjective statements to Dr. Pack.  Where, as here, the ALJ finds the claimant is not credible, a treating physician's opinion based entirely on the claimants subjective statements is not entitled to controlling

weight. *See Carter v. Comm'r of Soc. Sec.*, 411 F. App'x 295, 299 (11th Cir. 2011) (ALJ properly discounted the treating physician's opinion based on claimant's subjective complaints where the ALJ found the claimant not to be credible).[4]

Moreover, Dr. Beaty found that Plaintiff demonstrated average cognitive ability, spoke normally, and demonstrated intact and organized thought process. Then during his second evaluation, Dr. Beaty found Plaintiff displayed intact thought process, appropriate thought content, and average to high average cognitive ability.

This finding was consistent with the other medical reports. Dr. Chodosh found Plaintiff to be fully oriented. Dr. Humphreys determined that Plaintiff's remote memory was intact, Plaintiff gave adequate information, was able to perform simple multiplication, and demonstrated adequate thinking. At her appointment with WSC in September 2013 Plaintiff was alert, oriented, displayed no agitation or obvious appearance of depression. She smiled appropriately at times, her affect was appropriate to content, she had a normal rate and rhythm of speech, and her thoughts were clear and coherent.

---

[4] Plaintiff does not challenge the ALJ's finding that Plaintiff is not entirely credible.

Further, while Dr. Pack's opinion that Plaintiff is "totally disabled" is based on her long-term care of Plaintiff, Dr. Pack's own medical records suggest otherwise. *See Edwards v. Sullivan*, 937 F.2d 580, 583–84 (11th Cir. 1991) (good cause existed where treating physician's opinion was contradicted by other notations in the physician's own records). In July 2009, Dr. Pack found Plaintiff's bipolar disorder stable. Plaintiff also admitted to Dr. Pack that she was not compliant with her medication regimen and that she stops taking her medications when her mood improves. This belies Dr. Pack's assertion that Plaintiff's long-term care of Plaintiff demonstrates that Plaintiff is totally disabled.

Similarly, despite Dr. Pack's assertion that Plaintiff has poor or no ability to deal with the public and interact with supervisors, the medical records demonstrate that since her alleged onset date—with the exception of one incident on July 18, 2013 at WSC— Plaintiff has interacted appropriately with all of her healthcare providers. During both of Dr. Beaty's evaluations Plaintiff was pleasant, cooperative, answered questions readily, and maintained good eye contact. Similarly, both Dr. Chodosh and Dr. Humphreys found Plaintiff to be cooperative.

Likewise, although Dr. Pack opined that Plaintiff has poor or no ability

to deal with work stresses, there is no suggestion that work stresses
exacerbate her symptoms. And to the extent that Dr. Pack noted that
Plaintiff's Hepatitis C supports Dr. Pack's assessment, none of Plaintiff's
medical records even suggest that Plaintiff's Hepatitis C affects her ability
to deal with the public, interact with supervisors, or deal with work stresses.

Dr. Pack opined that Plaintiff has poor or no ability to behave in an
emotionally stable manner, relate predictably in social situations, or
demonstrate reliability. But after Plaintiff's medications were altered in May
2013, Plaintiff reported fewer anger outbursts and stated that her mother
told Plaintiff she was laughing more. And as discussed above, despite
Plaintiff's statements that she does not like being around people and gets
angry at them, Plaintiff was cooperative and pleasant with practically all of
her medical providers since her alleged onset date.

Plaintiff's own testimony also is at odds with Dr. Pack's conclusion
that Plaintiff is totally disabled, has no ability to deal with the pubic,
supervisors, or work stresses, cannot remember and carry out complex job
instructions, and has poor or no ability to behave in an emotionally stable
manner, relate predictably in social situations, or demonstrate reliability.
Notably, despite being diagnosed with bipolar disorder in 2004, Plaintiff

continued working in outside sales until 2009. Plaintiff readily admitted that she initially stopped working because she was laid off.  Even after she was laid off she pursued other employment but admitted that she quit those jobs because she became angry and was unhappy with the pay. Further, despite her alleged onset date of March 2, 2009, Plaintiff reported being in school pursuing her MBA in May 2013. Thus, Plaintiff's own activities of daily living, her testimony, and reports to other physicians regarding her limitations—or lack thereof—are inconsistent with Dr. Pack's opinion of disability.

The Court therefore concludes that the ALJ articulated more than adequate reasons, which are supported by substantial evidence, for discounting Dr. Pack's opinion. Accordingly, the Commissioner's decision should be affirmed.

## V.  **RECOMMENDATION**

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS** on the 26th day of October, 2016.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**